## CASADY v. CASADY et al.

No. 1770.   Decided December 14, 1906 (88 Pac. 32).

1. PLEADING — AMENDING COMPLAINT — CHANGING CAUSE OF AC-
   TION — ALLEGING REASONABLE VALUE.  Where a complaint alleged
   the facts in respect to a contract, the performance of services there-
   under and breach by defendant, an amendment merely adding a
   statement as to the reasonable value of the services rendered does
   not change the cause of action, or add a new cause of action, though
   it allows a recovery on a *quantum meruit*, instead of on an express
   contract.

2. TRIAL—LIMITING INSTRUCTIONS TO EVIDENCE.  Refusal of a general
   instruction, in an action for commissions for making a sale, that
   plaintiff could not recover if he exercised bad faith towards defend-
   ants, and giving an instruction that he could not recover if he did
   a certain thing with fraudulent intent, there being no evidence of
   any other exercise of bad faith, is proper.

APPEAL from District Court, Third District; M. L.
Ritchie, Judge.

Action by E. E. Casady against L. E. Casady and anoth-
er.  Judgment for plaintiff.

Defendants appeal.

AFFIRMED.

*Richards, Richards & Ferry* for appellants.

*Charles Baldwin* for respondent.

STRAUP, J.

1. This is an action brought to recover a commission for
the sale of real estate.   It was alleged in the complaint that
the defendants were the owners of the land, subject to the
title of Salt Lake county, acquired by it through a sale of the
land for taxes; that in March, 1905, a Mr. Anderson and a
Mr. Link were negotiating with the plaintiff, who is a brother

of the defendant L. E. Casady, for the purchase of the land; that the plaintiff wrote to his brother, acquainting him with the transactions, who replied that he had practically abandoned the property, but that, if plaintiff could work up a deal, he would see that he was well paid for his services; that thereafter the plaintiff redeemed the property from the county, paying therefor the sum of about $400; that he immediately notified the defendants of such fact, and stated in the letter that he thought he should have one-half of the price that might be obtained on a sale of the property; that, in reply thereto, the defendants approved the purchase and redemption, and tacitly accepted the plaintiff's proposition for a division of the proceeds; that in May, 1905, the defendants, in pursuance of the labors, efforts, and negotiations of the plaintiff, entered into a contract with Anderson for the purchase of the property for the sum of $9,800, of which $1,500 was paid in cash, and the balance to be paid on or before September, 1905; that in July, 1905, the balance was paid by Anderson to the defendants, and the property was by them conveyed to him. The plaintiff demanded a judgment for one-half of the $9,800. The defendants answered the complaint admitting that on and prior to March, 1905, Anderson and Link had been negotiating with the plaintiff for the purchase of the land, and that they were informed of such fact by the plaintiff, and that the defendant L. E. Casady wrote to the plaintiff that he had practically abandoned the property, and that, if plaintiff could work up a deal, he would see that he was well paid for the services rendered; that the plaintiff wrote to him that he thought he ought to have one-half of the price realized from a sale of the property, and that the property was sold to Anderson for the amount stated in the complaint. They denied that the sale resulted from any negotiations through the plaintiff or through his instrumentality, and alleged that the sale was effectuated directly through negotiations had between the defendants and the purchasers, and alleged that the services claimed to have been rendered by the plaintiff were valueless, and that the plaintiff without their authority or direction

acquired a tax title to the property, and held it adversely to them, and, by so doing, adverse to and inconsistent with any relation of agency; and that the plaintiff, inconsistent with such a relation, endeavored to procure a quitclaim deed to the property, for his own gain, from the defendants for the sum of $100, when in fact the property was of the value of $9,800. The case was tried before a court and jury, which resulted in a judgment in favor of the plaintiff for $3,000. The defendants appeal, contending that the court erred: (1) In refusing appellant's motion for a nonsuit, and in refusing to direct a verdict for them; (2) in permitting plaintiff to amend his complaint; (3) in permitting the introduction of evidence as to the reasonable value of the services: and (4) in instructing the jury.

2. The evidence in the case shows that the plaintiff resided in Salt Lake City, Utah, and that the defendants resided in Seattle, Wash. The land in question consists of about eighty-five acres, situated in Oquirrh Beach, about fifteen miles west of Salt Lake City. In the spring of 1905, the American Smelting & Refining Company began to acquire land in that vicinity for the purpose of a smelter site. Prior to that time the land was not worth to exceed $8 to $10 per acre. On March 29, 1905, Anderson and Link, who were acquiring property for the smelter company, inquired of plaintiff who the person was that owned the property in question, and as to whether it could be purchased. At this time the plaintiff had no knowledge of the proposed smelter site, or that the land was desired for such purpose. He was told by Anderson and Link that the land was wanted for a cattle ranch. He at once communicated with the defendants, informed them of the inquiry made and the likelihood of selling the property. The taxes upon the property had not been paid since 1893. It had been sold and purchased by the county for taxes. Some question was also raised as to a portion of the land being covered by other incumbrances. Anderson and Link told plaintiff that they thought they could pay about $800 for the land, subject to the taxes, and on March 31, they brought a quitclaim deed to him with a

consideration of $100 expressed therein, and requested him to forward it to the defendants to be executed, which the plaintiff did, stating to the defendants that he thought it best to have the deed made to him instead of the purchasers, and that he would have them fix it satisfactorily before delivering the deed. On April 3rd and 4th the defendant L. E. Casady wrote plaintiff that he would be glad to realize any amount within reason upon the property, as he had practically abandoned it, and if plaintiff worked up a deal he would see that he was well paid for his services. In the meantime the plaintiff learned that the purchasers desired the property for a smelter site and that they had been negotiating with the county for its purchase. The plaintiff at once and on the 3rd day of April, petitioned the county commissioners asking to redeem the land from the county. He was permitted to do so and purchased it, paying therefor the sum of about $400 with moneys advanced by himself, and took the deed in his own name. On April 7th he wrote the defendants of what he had done and told them that he had learned that the purchasers wanted the property for a smelter site, and that he believed that they would be able now to get about $2,000 for the property. The defendants replied directing the plaintiff to ask $5,000. The plaintiff presented the offer, but it was refused. This refusal was communicated to the defendants. Later and on April 17th, the purchasers stated to the plaintiff that they would take the property at $5,000 and desired him to sign a contract. The plaintiff declined to do so, but wired the defendants that he had given an option until September 1st for $5,000, $500 cash, and to wire a confirmation. Defendants wired to hold the proceedings, and that the defendant L. E. Casady would be in Salt Lake in a few days. A few days thereafter the defendant arrived. He and the plaintiff drove out to the property, and while there they discovered that it was wanted for a particular purpose. The defendant then stated to plaintiff that they would now ask the puchasers $10,000, to which the plaintiff readily assented. The next day they saw the purchasers, but told them they were not ready to do business. On the following day

they told them that they knew what the prpoerty was wanted
for, and that they would not sell it for $5,000, but now want-
ed $10,000. After some negotiations, in the presence of and
with plaintiff and defendant L. E. Casady on the one side,
and the purchasers on the other, the land was fi-
nally sold for the sum of $9,800, $1,500 of which was
paid in cash and $8,300 in July, when the conveyance was
made. After the transaction was closed and the first pay-
ment made, the plaintiff asked the defendant L. E. Casady
for a settlement, and demanded a half interest of the pro-
ceeds. The defendant replied that he did not owe him any-
thing; that he only sold his (defendant's) interest; that he
had not sold plaintiff's tax title interest, and for plaintiff
to "hold them up and make them pay you at least as much as
they paid me," for such interest. The plaintiff replied that
he could not do so, because, in consideration of the $9,800,
it was agreed to give the purchasers a deed for taxes. The de-
fendant refused to pay plaintiff anything.

3. During the course of the trial the plaintiff was given
leave to amend his complaint by inserting, "Comes now the
plaintiff and for an amendment to his complaint says that
the services so rendered by the plaintiff for defendants were
reasonably worth fifty per cent of the amount received by the
defendants, to wit, fifty per cent of $9,800." The defend-
ants objected to the allowance of the amendment on the
ground that the amendment stated an additional and differ-
ent cause of action than that alleged in the complaint, for
that, the cause of action as stated in the complaint was upon
an express contract, while the amendment stated a cause of
action upon a *quantum meruit,* and that the complaint with
the amendment stated two causes of action not separately al-
leged, and that, therefore the court was without authority
to allow the amendment. When thereafter witnesses on be-
half of the plaintiff were interrogated as to the value of the
services rendered by the plaintiff, the defendants objected
thereto upon the same grounds, and, for the same reasons,
requested the court to grant a nonsuit and to direct a verdict,
claiming that the original complaint was upon an express con-

tract of which there was no evidence in support, and that the court was without authority to allow the amendment permitting the plaintiff to recover on a *quantum meruit*. We think no error was committed in the rulings. It is not clear that the original complaint declared upon an express contract, and that the plaintiff could not have proceeded upon the theory of a *quantum meruit* without the amendment. In the original complaint the plaintiff merely alleged the facts of the transaction as they occurred between the parties, and upon them plaintiff was entitled to whatever relief those facts showed. The amendment did not state any new facts upon which a new cause of action was based. The facts as stated in the complaint were not changed. The only addition made by the amendment was a statement as to the reasonable value of the services rendered. All the facts with respect to the contract, the performance of the services, and the circumstances under which they were rendered, the things said and done by the parties, the existence of all the conditions precedent to payment, and the breach of the defendants, were not changed, but all remained the same. In a case where the complaint declared on an agreed price for services, and where an amendment alleging their reasonable value was permitted, the court said:

"Upon the new trial of this action, evidence as to the *quantum meruits* was offered, which was objected to by the defendant's counsel as not being within the pleadings, which objection was sustained, and the plaintiff was thereupon, over the exception of the defendant, allowed to amend his complaint, alleging the reasonable value of the services. It is claimed that the court had no power to allow this amendment, upon the ground that it substantially changed the cause of action. This objection does not seem to be well founded. The cause of action was not changed. The declaration was for work, labor, and services, and such the declaration remained, even after the amendment. The method of proving the damages, only, was changed." (*Copeland v. Johnson Mfg. Co.* [Sup.], 3 N. Y. Supp. 42. To the same effect are: *Cox v. McLaughlin*, 76 Cal. 60, 18 Pac. 100, 9 Am. St. Rep, 164; *Cowdery v. McChesney* [Cal. Sup.], 57 Pac. 221.)

Mr. Pomeroy, in his work on Code Remedies, in defining the term, "cause of action," and in distinguishing it from "the remedy," at sections 347 and 348 (4th Ed.) says:

"Every judicial action must, therefore, involve the following elements: A primary right possessed by the plaintiff, and a corresponding primary duty devolving upon the defendant; a delict or wrong done by the defendant which consisted in a breach of such primary right and duty; a remedial right in favor of the plaintiff, and a remedial duty resting on the defendant springing from this delict; and finally, the remedy or relief itself. Every action, however complicated, or however simple, must contain these essential elements. Of these elements, the primary right and duty and the delict or wrong combined constitute the cause of action in the legal sense of the term, and as it is used in the Codes of the several states. They are the legal cause or foundation whence the right of action springs, this right of action being identical with the 'remedial right' as designated in my analysis. In accordance with the principles of pleading adopted in the new American system, the existence of a legal right in an abstract form is never alleged by the plaintiff; but, instead thereof, the facts from which that right arises are set forth, and the right itself is inferred therefrom. The cause of action, as it appears in the complaint when properly pleaded, will therefore always be the facts from which the plaintiff's primary right, and the defendant's corresponding primary duty, have arisen, together with the facts which constitute the defendant's delict or act of wrong. The cause of action thus defined is plainly different from the remedial right, and from the remedy or relief itself. The remedial right is the consequence, the secondary right, which springs into being from the breach of the plaintiff's primary right by the defendant's wrong, while the remedy is the consummation or satisfaction of this remedial right."

It is, therefore, clear to us that the facts with respect to plaintiff's primary right, and the corresponding primary duty devolving upon the defendants and the breach thereof, were in no particular changed by the amendment. The nature of the action was not changed, nor was one cause of action substituted for another, nor there was an additional cause of action stated.

4. Complaint is also made of the refusal of the court to give the jury the following request: "If you find from the evidence that the plaintiff did not represent the defendants in good faith and at all times for their best interests during the existence of said contract, or in the consummation of said sale, you must then find that he has not performed the obligations of the contract to be performed by him, and the defendants cannot be held in any sum whatever." The court charged the jury as follows: "If you find from the evidence that plaintiff concealed from the defendants the amount of

the purchase price offered with the intention of defrauding them, this would be a fraud and a breach of contract upon the part of the plaintiff, and he is not entitled to recover." The only allegations in the answer bearing upon such an issue are that the plaintiff, inconsistent with the relation of agency, acquired the tax title, held it adversely to the defendants, and that, for his own profit, he sought to procure from them a quitclaim deed for $100, when the property was of the value of $9,800. In no other particular is bad faith or wrongful conduct charged on the part of plaintiff. There is no proof whatever that the plaintiff held, or attempted to hold, the tax title adversely to the defendants. The evidence shows it was only through his promptness and diligence, and by the advancement of his own money, that he prevented the purchasers from acquiring such a title. Having himself advanced the sum of $400 for such purpose, it was natural that such title be taken in his own name. He immediately informed defendants of what he had done, and in no manner asserted any title to the property as against the defendants. To the contrary, the plaintiff, immediately on acquiring the tax title, wrote the defendants that he "did not expect to take any advantage of your title,' but only wished to protect you. If I had not got it just when I did, they [the purchasers] would have had it the same day, then you would have had practically no claim." Likewise, there is no evidence that the plaintiff attempted to procure a quitclaim deed from the defendants in any manner as alleged in the answer, except as may be inferred from the mere fact that he sent a deed to the defendants to be executed, which expressed a consideration of $100. But the circumstances under which the deed was sent, and his connection therewith, and his relation thereto, were at the time fully explained to them by him. It is not made to appear that, by the sending of such a deed, the plaintiff sought, or attempted to gain, any personal advantage. At that time the plaintiff was informed that the land was desired for a cattle ranch. He then had no knowledge of the real purpose for which the land was desired, or that a smelter was to be located at its immediate vicin-

ity. It is not made to appear that the consideration express-ed in the deed was to be the consideration for which the land was to be sold. The letter, written by the plaintiff and sent to the defendants with the deed, indicates that it was not intended as such. Nothing is made to appear from which it it can be said that the defendants understood the deed as expressing a full consideration, or that they so treated it or so understood it. Indeed, the evidence most conclusively shows that they did not so understand it, and did not so act upon it. The only circumstances from which any inference of bad faith might be drawn are the failure of the plaintiff to communicate to the defendants the offer of $800 made to him at or prior to the sending of the deed, and his telegram to the defendants that he had given the $5,000 option when, in fact, he had not done so. This feature of the case, however, was fully covered by the charge of the court wherein the jury were told that, if the plaintiff concealed from the defendants the amount of the purchase price offered, etc., he would not be entitled to recover. Furthermore, whatever inference against the plaintiff might be drawn from the circumstances were entirely removed by the subsequent acts and conduct of the parties. The defendants made no complaint, and in no manner attempted to change their course of conduct with respect to the transaction upon their discovery of all the facts. Aside from these considerations, it is very doubtful whether the allegations of the defendants were sufficiently broad to entitle them to a charge as requested by them, for their allegations were directed merely to the nonexistence of agency, and not to plaintiff's bad faith or wrongful conduct arising out of the relation of agency, or to a breach of trust whilst acting in such capacity. The court did not err in refusing the request.

The judgment of the court below is affirmed, with costs.